**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
FRANK KIM,

       Plaintiff,                                                    **COMPLAINT**

-*against*-

                                                                *PLAINTIFF DEMANDS*

BTG PACTUAL ASSET MANAGEMENT US, LLC;                *A TRIAL BY JURY*
ANASTASIOS ARGEROS; CYRIL DELAPRAZ;
MICHAEL GRANT; JACK McCLEARY; and
WILLIAM ROSE,

        Defendants.
------------------------------------------------------------------X

     Plaintiff, FRANK KIM, by and through his undersigned attorneys, alleges the following

for his Complaint upon personal knowledge as to himself and his own actions and upon

information and belief as to all other matters which includes, among other things, the investigation

by his counsel, which includes a review of public documents filed with the U.S. Securities and

Exchange Commission ("SEC") by Defendant BTG Pactual Asset Management US, LLC ("BTG

Pactual," "BTG," or the "Company"), public news reports, press releases, and investor

publications.

## NATURE OF THE CASE

     1.    This is a civil action based upon Defendants' violations of Plaintiff's rights

guaranteed to him by: (i) the race discrimination and retaliation provisions of 42 U.S.C. § 1981

("Section 1981"); (ii) the race discrimination and retaliation provisions of the New York State

Human Rights Law, New York State Executive Law, § 296 *et seq.* ("NYSHRL"); (iii) the race

discrimination and retaliation provisions of the New York City Human Rights Law, New York

City Administrative Code § 8-107 *et seq.* ("NYCHRL"); and (iv) any other claim(s) that can be

inferred from the facts set forth herein.  Plaintiff's action is also based on protections afforded to

him under the Dodd-Frank Act of 2010 ("Dodd-Frank Act") (15 U.S.C. § 78u-6(h)). Plaintiff suffered retaliation in the form of harassment, demotion, and ultimately, firing, as a result of his reporting unlawful activity in connection with securities offerings.  He made these reports to both his superiors within BTG Pactual and to the SEC, and other state and federal regulators.

2.      BTG Pactual operated and encouraged a work environment in which discriminatory conduct flourished at the Company's New York Offices and, being of Korean national/ethnic origin, was subjected to such conduct, including repeated harassing comments connected with his race.

3.      Mr. Kim now seeks redress for the injuries he has suffered as a result of his employer's discrimination and retaliation on the basis of his race (Asian).

4.      Mr. Kim made protected disclosures to the effect that BTG Pactual was fraudulently misleading investors about the performance of its Consumer Debt Fund.  In so doing, BTG Pactual was in breach of various legal and regulatory obligations.  After Mr. Kim blew the whistle to his supervisor, the Chief Risk Officer Cyril Delapraz, he was isolated at work and subjected to an even stronger course of bullying, including racial intimidation and harassment.  This culminated in Mr. Kim complaining about his treatment to BTG Pactual's Chief Compliance Officer Richard Gruber in the spring of 2019.  In response, BTG Pactual placed Mr. Kim on administrative leave against his wishes and ultimately—after learning he had reported information as a whistleblower to the SEC and other federal and state administrative agencies—fired him.

5.      Mr. Kim has been damaged by BTG Pactual's serious race discrimination, victimization, and aggressive retaliation to whistleblowing.

## JURISDICTION AND VENUE

6.      Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343, and the Dodd-Frank Act, 15 U.S.C. § 78u-6.

7.      The Court has supplemental jurisdiction over the claims of Plaintiff brought under state law pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this District in that a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of the State of New York.  28 U.S.C. § 1391(b).

## PROCEDURAL PREREQUISITES

9.      Prior to the commencement of this action, Plaintiff served a copy of this complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York, in accordance with N.Y.C. Admin. Code § 8-502(c).

10.      Prior to commencement of this action and his wrongful discharge from Defendant's employment, Plaintiff brought his concerns of illegal activity to his supervisors, the SEC, the CFTC and other federal regulators.

## PARTIES

11.      **Plaintiff Frank Kim** is an Asian man of Korean descent and was a resident of the State of New York, New York County.  At all relevant times herein, Mr. Kim was an employee in the risk management department of BTG Pactual at the Company's New York offices.  Prior to commencement of this action, Plaintiff gathered the Anti-Asian Hate community support from the Korean American Coalition and the Brown University Asian American Alumni Alliance.

12.      At all relevant times herein, Mr. Kim was and is a "person" and an "employee" entitled to protection as defined by state and federal laws.

13.      **Defendant BTG Pactual** is a Brazilian financial company that operates in the markets of investment banking, wealth management, and asset management.  At all relevant times, BTG Pactual was and is a foreign corporation authorized to do business in the State of New York, with its place of business located at 601 Lexington Avenue, 57th Floor, New York, NY 10022.

14.     At all relevant times herein, Defendant Pactual "employed" four or more "employees," and is thus an "employer" within the meaning of Section 1981, the NYSHRL, and the NYCHRL.

15.     During Mr. Kim's employment, the Company became the subject of an ongoing corruption probe by Brazilian authorities reportedly looking into allegations that the Company advised its clients on money laundering.  In August 2019, Brazil's federal police raided BTG Pactual's headquarters, resulting in the Company shedding more than $4 billion in market capitalization in two days of trading.[1]

16.     **Defendant Cyril Delapraz** is Pactual's Chief Risk Officer with offices at Berkeley Square House, 4-19 Berkeley Square, London W1J 6BR, United Kingdom.  Mr. Delapraz was Mr. Kim's direct supervisor and worked from the London office as the Chief Risk Officer.  Mr. Kim confided in him most of the harassment and fraud as they happened, but Mr. Delapraz took no action to remedy the harassment of Mr. Kim, nor take action to remedy the compliance matters that Mr. Kim complained of.

17.     **Defendant Anastasios Argeros** is a portfolio manager for Pactual since 2010.  Mr. Argeros harassed Mr. Kim in retaliation for calling out fraudulent representations to investors.  Mr. Argeros used racial slurs in front of and in reference to Mr. Kim and others.  As Jack McCleary's "right hand," Mr. Argeros' racial bias and poor impression of Blacks was evident in the Consumer Debt Fund's ("CDF") use of HUD data in their pricing model.

18.     **Defendant Michael Grant** was also a portfolio manager for Pactual.  Mr. Grant

---

[1] *See* "Brazil police raid investment bank BTG Pactual, shares sink over 11%," CNBC (Aug. 23, 2019), *available at,* https://www.cnbc.com/2019/08/23/brazil-police-raid-investment-bank-btg-pactual-shares-sink-over-11percent.html; Vinicius Andrade and Felipe Marques, "BTG Sheds $4 Billion in Value Over Two Days On Police Probe," Bloomberg (Aug. 26, 2019), *available at* https://www.bloomberg.com/news/articles/2019-08-26/btg-loses-5-billion-in-two-days-amid-new-corruption-allegations

joined in Mr. Argeros's harassment, retaliation, and use of racial slurs in front of and in reference to Mr. Kim.

19.    **Defendant Jack McCleary** is a Senior Partner & Senior Portfolio Manager and joined others in the harassment, retaliation, and derogatory comments against Mr. Kim, including the statement that Mr. Kim should take Adderall[2] because "it will open him up."

20.    **Defendant William Rose**, Defendant's Chief Operating Officer, marginalized Mr. Kim and moved him to a desk location in the back office section of the office next to the restrooms, away from his co-workers in Asset Backed Securities including Argeros and Grant.

## RELEVANT NON-PARTY ENTITIES

21.    **The BTG Pactual Consumer Debt Fund** ("the Debt Fund" or the "Fund") was a BTG investment fund comprised almost entirely of bonds backed by unsecured consumer loans. As discussed herein, Mr. Kim, as Market Risk Analyst for the New York Office, had a direct interest in determining the propriety of statements made concerning the Fund.  Mr. Kim learned that the marketing materials used to promote the Fund contained significant, material errors and were manipulative and deceptive towards potential investors.  After reporting these concerns to his superiors, the SEC, CFTC and others, Mr. Kim was harassed, suspended, and ultimately fired in violation of the Dodd Frank Act.

## FACTUAL ALLEGATIONS

A.    **Mr. Kim's Employment and BTG Pactual's Campaign of Racial Harassment**

22.    On or about June 15, 2015, BTG recruited and hired Mr. Kim as a Market Risk Analyst earning an annual salary of $140,000 plus a discretionary bonus.  In the near-decade prior

---

[2] Adderall is commonly used for attention deficit hyperactivity disorder (ADHD) and narcolepsy. It is a Schedule II controlled substance, which means there is a high risk for addiction or abuse. https://www.livescience.com/41013-adderall.html

to joining the Company, Mr. Kim had built an impressive career in the financial industry, playing a key role in the advancement of a start-up investment firm by creating quantitative trading systems for the firm's top portfolio managers.

23.     Mr. Kim was and remains well qualified for his position with BTG.  He has a natural aptitude for finance and numbers, receiving a perfect Math score on his Scholastic Assessment Test (SAT) and his Graduate Record Examination (GRE). Mr. Kim graduated from Brown University with a bachelor's degree in Computer Science and Economics in 2006.  While working full time, Mr. Kim received a Mathematics in Finance master's degree from New York University's Courant Institute of Mathematical Sciences; a program that has a less than six percent admission rate.  At the time of hire, Mr. Kim had over eight years' experience on the "buy-side" working at a successful multi-billion quantitative hedge fund and a multi-billion credit focused private equity firm.  At the former, Mr. Kim helped build out the Portfolio & Risk Analytics for the startup hedge fund that grew to $4.5 billion assets under management.

24.     During his time at BTG, Mr. Kim received calls from recruiters offering him other employment opportunities.  This was most prevalent when Defendant BTG's CEO was arrested.  A number of BTG employees left.  Mr. Kim was offered and accepted a retention bonus by BTG to stay.

25.     As Market Risk Analyst for BTG Pactual, Mr. Kim was responsible for conducting regressions, value-at-risk and stress scenario analyses, and assessing trading strategies to provide risk profile and performance projections.

26.     In or around March 2019, despite the harassment and bullying by traders in the New York office, BTG's Luxembourg-based Timberland Fund sought out Mr. Kim for a promotion to Dedicated Risk Manager on that fund's board, which has over 2.2 billion acres of commercial timber land under management on four continents.  In that position, Mr. Kim earned

$230,000 per year and received a $1,600 monthly allowance.  This did not, however, stop the campaign of harassment emanating from the New York office.

27.     Mr. Kim consistently received positive reviews of his work performance, which met or exceeded expectations, as evidenced by his promotion and raise.  Despite his exemplary work, Mr. Kim was subjected to constant racial harassment by Company personnel.  One repeat offender was Anastasios Argeros – a portfolio manager for the Company since 2010 and a former partner of Sirona Advisors and Director of UBS.

28.     This relentless racial harassment included, but was not limited to, the following daily examples:

a)   In early 2018, Mr. Argeros with Michael Grant accosted Mr. Kim in an elevator. Argeros pointed to his own eyes and said "Round Eyes!" – an openly racial comment directed at Mr. Kim because of his Korean descent;

b)   Around early 2018, Mr. Argeros told Mr. Kim that a group of Asians clustered together is called a "Chinese Wall;"

c)   Mr. Argeros continuously asked Mr. Kim if he visited Korean massage parlors, clearly implying that these organizations were fronts for prostitution that a Korean would be predisposed towards frequenting;

d)   Upon information and belief, on several occasions, Jeff Ho, a BTG Pactual employee of East Asian descent, confronted Mr. Argeros over his racist comments.  Mr. Argeros would brush it off by saying that he loves to eat at "Big Wong," a restaurant in Chinatown;

e)   In late 2018, a colleague, Fabrizio Giurda, told Mr. Kim that another employee of Asian descent was a white supervisor's "bitch," because the Asian-American employee did all the work, and the white supervisor received all the credit.

f)   Michael Grant, a Portfolio Manager reporting to Messrs. Jack McCleary (Senior

Partner & Senior Portfolio Manager) and Argeros, stated to Mr. Argeros and

others that the Mr. Kim should take Adderall because "it will open him up."

g)   In early 2018, Mr. Argeros stated that Mr.  Kim did not know "what Black

people are like" and followed this with critical comments of the behavior of

"Black people" that Argeros purportedly witnessed in Philadelphia. As Jack

McCleary's "right hand," Mr. Argeros' racial bias and poor impression of

Blacks was evident in the Consumer Debt Fund's ("CDF") use of Housing

and Urban Development ("HUD") data in their pricing model.  Mr. Kim was

concerned that this gave rise to the risk of redlining (racially discriminatory

exclusion of services).

h)   Mr. Argeros would routinely watch "South Park" and "Family Guy" on

YouTube, raising the volume to dominate the work area whenever the actors

made offensive and discriminatory comments.

i)   Mr. Argeros and Mr. Grant would routinely and openly mock women they

found unattractive on CNBC, making crude comments about their looks and

bodies.

j)   Mr. Argeros made random offensive race-based commentary to other

employees; comparing an East Indian employee who was a well-regarded

athlete to an "Oompa Loompa" and "James Trivette."

k)   During the WPGA, Mr. Argeros opined that the Korean golfers look like men;

a direct reference to their ethnic features.

l)   Argeros would routinely walk by a female portfolio manager and state that her

area "smelled like fish;" a crude reference to female hygiene.

m) Mr. Argeros openly stated that he did not like Albanians.  He referred to Albanians derogatorily by dubbing them the "Mexicans of the Mediterranean;" due to his lowly views of Mexicans and Albanians.

n) Mr. McCleary openly stated that he did not like to do business with Muslims, derogatorily indicating that they would literally "chop your head off" if you lose their money.

Despite Mr. Kim's numerous complaints about the hostile work environment, the discriminatory comments continued.

**B.    The BTG Pactual Consumer Debt Fund and Peer-to-Peer Lending**

29.    The "Consumer Debt Fund" or "Fund" (discussed *infra* at ¶ 21) was a BTG investment fund established in 2016 and managed primarily by Messrs. McCleary and Argeros, Mr. Rose, Chief Operating Officer, also traded for the Fund.  Michael Grant modelled the price and risk of the Marketplace Lending Loans for the Fund.

30.    The Fund was comprised almost entirely of bonds backed by unsecured consumer loans. These consumer loans were often characterized by BTG Pactual as the product of "marketplace" lending.  This is more commonly referred to as "peer-to-peer" lending, the practice of lending money to individuals or businesses through online services that match lenders with borrowers.  Peer-to-peer lending companies, such as Lending Club, generally offer their services online, and attempt to operate with lower overhead and provide their services at a lower cost than traditional financial institutions.

31.    Fund performance is normally advertised with information about a fund's gross and net performance.  Gross performance considers inputs such as profit (or loss), cash on hand, and the total amount invested. Net performance additionally considers the investment bank's management and/or performance fees. Failing to provide this information accurately would

amount to violation of legal and regulatory obligations, and may amount to fraud if done knowingly.

**C.    Mr. Kim Finds Misleading Statements in the Fund's Investor Presentation**

32.    On July 31, 2018, Mr. Argeros forwarded an email to Mr. Kim attaching a PowerPoint presentation which, among other things, purported to detail the performance of the Fund (the "Presentation").  Mr. Kim understood the Presentation was intended for external use, to advertise the Fund to potential investors.  Mr. Argeros instructed Mr. Kim to update the last three months of performance numbers.

33.    Mr. Kim noticed that Mr. Argeros left a suspicious email chain on the forwarded email expressing Head of Global Distribution Caroline Boillod's appreciation for having the risk management slides removed from the presentation.

34.    The email made Mr. Kim concerned that information about the risks of investing would be concealed from potential investors.  Indeed, one of the critical criteria for potential investors when determining whether to invest is a fund's past performance as compared to the performance of similar investment vehicles.  As a result, it is crucial that a fund's representations be completely accurate so as not to mislead investors.

35.    Mr. Kim was further concerned when, on August 1, 2018, Cyril Delapraz, the Company's Chief Risk Officer, emailed Ms. Boillod advising her that with regard to the Consumer Debt Fund: "I prefer all the queries regarding PnL be done by [another team] not by Risk."

36.    In fact, to Mr. Kim's knowledge, no one in Risk Management ever created any risk management slides for the Presentation.  Likewise, no one in Risk Management ever saw any such slides or authorized their removal from the Presentation.

37.    Mr. Kim reviewed the Presentation as instructed and noticed two significant errors

in the performance return chart page provided to investors in the Presentation.  The same day he emailed Ms. Boillod information about the errors, copying Messrs. Argeros, McCleary, and Delapraz.

38.     On August 1, 2018, Mr. Delapraz emailed and later telephoned Mr. Kim to discuss the Presentation.  Mr. Delapraz said that he suspected the performance figures in the Presentation were inflated by 50 percent.  He instructed Mr. Kim to determine how those figures had been calculated by reviewing the data on which they were based.

39.     It soon became clear, one problem with the Presentation included a failure to include cash on hand in the calculation of the Fund's gross performance over time.  This critical omission resulted in a substantial inflation of the Fund's purported gross returns, which investors rely upon in making investing decisions.

40.     Normally, gross performance is determined by dividing profit or loss by allocated capital – which consists of both invested capital *and* cash on hand. Essentially:

$$Monthly\ Return = \frac{(Profit\ or\ Loss)}{(\text{Allocated Capital})} = \frac{(Profit\ or\ Loss)}{(\text{Invested Capital}) + (\text{Cash in Hand})}$$

41.     By omitting cash on hand, the allocated capital becomes only invested capital.  With a smaller denominator, the monthly returns become inflated when there is a positive month.  This is because cash would be held in very conservative financial instruments which would provide optimum liquidity.  As such, the cash is a low-yield "investment," producing returns similar to what investors would receive through money market funds or certificates of deposit.  One can manipulate the Fund's performance by omitting the performance of its lowest yielding asset, which is exactly what Mr. Kim was concerned about with the Presentation.  When cash had a negative effect to their Profit-and-Loss, Mr. McCleary and Mr. Argeros claimed that the former CIO David Martin *over-allocated* cash to their strategy when there were no opportunities to invest.

Conversely, when cash was needed for an opportunity to increase their Profit-and-Loss, Mr. McCleary and Mr. Argeros would argue that their strategy was being *under-allocated*.

42.     Moreover, the Presentation completely failed to include information about the Fund's *net* performance, which also takes into account the Fund's management and performance-based fees – another important factor for investors in making determinations about how to use their money.

43.     These omissions created a false and/or misleading impression of the Fund's performance for those who would see the Presentation (including potential investors).  Further, it amounted or would amount to a breach of the U.S. securities laws.

44.     Mr. Kim raised his concerns to, among others, Messrs. Argeros and McCleary. Bizarrely, and without reference to any rule or regulation, Messrs. Argeros and McCleary claimed that they did not need to account for all the cash on hand in the fund because "too much" cash had been allocated.  Mr. Kim is unaware of any exception permitting a failure to include cash on hand in a gross performance report because "too much" cash has been allocated to a fund.

45.     According to Messrs. Argeros and McCleary, the former Chief Investment Officer, David Martin had allocated more cash to the Fund than needed, and they did not have any investment opportunities to use the cash.

46.     They did not even address Mr. Kim's concerns that potential investors should be provided with net performance numbers in the Presentation – even though such disclosure was specifically called for by the Company's Compliance Manual,[3] which states:

---

[3] BTG Pactual US AM Compliance Manual (2018) pg. 27-28.

**5.4.1   Gross and Net of Fee Performance Results / Side-by-Side Presentations**

Pursuant to the AIMR (December 18, 1996) no-action letter ("AIMR no-action letter"), the Firm would not necessarily violate the anti fraud provisions of the Advisers Act if it distributed an advertisement containing both gross and net performance numbers provided that both sets of figures receive equal prominence, and are presented in a format that permits easy

comparisons, accompanied by sufficient disclosure such as a specific reference to the lack of inclusion of investment advisory fees and other expenses to prevent the numbers from being misleading.

47.     Based on the above, BTG was violating its own internal policies and procedures by failing to include net return information in the Presentation.  Mr. Kim rightly brought this to BTG's attention.  Yet, as described below, he was viciously disparaged and defamed for his efforts.

48.     On August 1, 2018, Mr. Delapraz—the Chief Risk Officer of the Company—called Ms. Boillod and shouted at her to stop sending investors the inaccurate Presentation.  Apparently, this instruction came too late, however, as Ms. Boillod, acknowledging her wrong-doing, later apologized to Mr. Kim for the Presentation having been sent to investors without any corrections or revisions.  Mr. Kim is not aware of any subsequent corrective measures being taken by BTG to minimize the fallout from the false and misleading Presentation.

49.     In addition to the above, there were other problems with the Fund Presentation.  For example:

a)  The Presentation purports that about 80% of the loans are for debt consolidation to pay credit cards.  However, it fails to mention that some of these loans are used for non-household purposes, such as $4,000 spring break vacations with little recourse in case of default.

b)  Monthly returns were simply added and not compounded to calculate each year's

Year-to-Date return.

c)  The Presentation can easily be read as identifying Ernst & Young as the Fund's auditor and Skadden, Arps, Slate, Meagher & Flom ("Skadden") as its legal advisor. Based upon information and belief, neither assertion is true, because neither firm advised the Fund.  Since Skadden also conducted the internal investigation and the firm's name was on the fraudulent marketing material, this was an apparent conflict of interest.

d)  After coming out of a meeting with a Peer-to-Peer lender, Mr. McCleary stated on BTG's trading floor that these Peer-to-Peer Consumer Loan Asset types "would cause the next financial crisis."

50.     Because he suspected reckless behavior from CDF team (Jack McCleary), the BTG Pactual Chief Investment Officer of the New York Office Bob Pearsall warned his subordinates Jack McCleary and Anastasios Argeros that Mr. Pearsall is an ethical finance professional and had no qualms reporting his own colleagues who are participating in fraud to the regulatory authorities. In fact, in the past, Mr. Pearsall testified in a legal proceeding against his former partner at the hedge fund that they co-founded.

51.     At his exit interview before he resigned, Mr. Pearsall warned Mr. Delapraz about what he felt were the inherent dangers of investing in consumer loans.  According to Mr. Pearsall, consumer loans are alternatives for people who do not have good enough credit to get approved for credit cards.  Also, Mr. Pearsall further warned Mr. Delapraz that the rational consumer loan borrowers will first make payments on their mortgage and auto loans before they ever make payments on any consumer loans.  It is highly concerning that according to loan-level data some borrowers were taking out thousands of dollar consumer loans for extravagant wedding ceremonies and $4,000 spring break vacations with little recourse in case of default.

**D.     Kim Mr. Faces Retaliation for His Report of Potential Wrongdoing**

52.     On or around August 3, 2018, Mr. Kim came to work and found Mr. McCleary in a conference room by the legal department with Robert Pearsall, Head of BTG's Securitized Products Division.  Mr. Pearsall asked Mr. Kim if he wanted to sit next to Vikrant Manwatkar, a portfolio manager at the Company, because maybe Mr. Kim was no longer learning from the Asset Backed Securities ("ABS") team members.

53.     Mr. Pearsall then ordered the move, which isolated Mr. Kim from the employees he was tasked with monitoring and thereby impacted his ability to perform his job.

54.     That same week, Mr. McCleary approached Mr. Kim in an intimidating manner and told Mr. Kim that he would never work in finance again and that he should go find a job in Brooklyn.

55.     On August 6, 2018, Mr. Kim informed his boss, Mr. Delapraz about Mr. McCleary's intimidation tactics.  Mr. Delapraz responded by telling Mr. Kim to "calm down," and that he should have responded that he would find a better job, and to just enjoy his lunch.

56.     Mr. Kim also informed Mr. Delapraz that Mr. Kim was being relocated away from the ABS team members.  Mr. Delapraz was troubled by this and stated that they would discuss the issue when they saw each other next.[4]

57.     On October 4, 2018, William Rose, Defendant's Chief Operating Officer, distributed new seating assignments, placing Mr. Kim at a desk next to back office employees. This move further isolated Mr. Kim and rendered it even more difficult for him to perform his job duties.  The new seating chart follows:

---

[4] Mr. Delapraz was based in Defendant's London, U.K. office.

**Asset Management**

| | | | | |
|---|---|---|---|---|
| | Caroline Boillod | | Fernando Lamas | |
| Cedric Rhodes | Michael Roxland | | Gerrity Lansing | |
| | | | Mitchell Kosches | P 12 |
| John Sung | Gustavo Binnie | Bill Barrett | Kory Zverin | |
| Eduardo Menezes | Frank Kim | Marcos Flaks | Joe Ilardi | 29 |
| | | Bill Rose | Mike Grant | |
| | John Fath | Anastasios Argeros | Jack McCleary | P 30 |
| | | Antonio Rocha | Cristina Suarez | |
| | Joe Pasqualichio | Ang Lee | Marcelo Falcon | P 18 |
| Jon Bisgaier | | | Philip Harris | |
| Rudolph Huc | Johanna Torres | Guilherme Salgueiro | | P 1 |
| Alicja Krydus | Aja Richmond | Enio Shinohara | | |

Best regards,
Aja

**Aja Richmond**
Corporate Services

58.     After the seating arrangement away from the ABS team on the open trading floor,
Strategist Jeff Ho who was now sitting in the same row asked Mr. Kim why his seating was
changed.  Mr. Kim told Mr. Ho that Mr. McCleary was upset that he reported him to the Chief Risk
Officer Cyril Delapraz.  For multiple years, Mr. Ho previously worked with Mr. McCleary at UBS
and knew intimate details including when Mr. McCleary was cheating on his wife at the time.  Mr.
Ho expressed that in his opinion it was a grave mistake to report the vindictive Mr. McCleary to
Mr. Delapraz and that Mr. Ho expected Mr. McCleary would retaliate against Mr. Kim for revenge

at all costs.

59.     Mr. Delapraz complained to Mr. Rose that Plaintiff was supposed to be seated with the ABS employees he was tasked with monitoring.  Mr. Rose refused any request to reverse course.

60.     On or around October 17, 2018, Mr. McCleary accosted Mr. Kim incorrectly accusing the Risk Management department of giving preferential treatment to the GDO Fund in London, U.K.  At all costs, Mr. McCleary was desperate to increase the allocated cash to his strategy after the massive multi-billion dollar investor redemptions that followed the incarceration of former CEO Andre Esteves.

61.     After Mr. Kim was relegated to the back office, Mr. McCleary confessed that his new seating arrangement was intended to keep Mr. Kim from performing his job duties with respect to the ABS team members.  Mr. McCleary threatened and belittled Mr. Kim by stating that he would be moved beside the coffee machine next.

62.     Equally troubling was the Company's exclusion of Mr. Kim from its risk management platform, which was essential to Mr. Kim's job as a risk analyst.  His access to the platform was only reinstated after Mr. Delapraz flew to New York and confronted Mr. Argeros, who soon provided him.

63.     On October 24, 2018, Mr. Kim told Mr. Delapraz that Mr. McCleary was encouraging Mr. Rose to harass him.  Plaintiff additionally informed Mr. Delapraz of Mr. McCleary's comments regarding his new desk location.

64.     Other than restoring access to the risk management platform, BTG Pactual otherwise took no other steps to support Mr. Kim or to resolve his complaints.  Mr. McCleary told Mr. Rose that Mr. Kim tried to report him to the internal whistle-blower hotline email and that Mr. Rose should "take care of him."   Mr. Kim believes that is why Mr. Rose chose a seating

arrangement in which Mr. Kim could be monitored.   Mr. McCleary also passed along Mr. Kim's

personal information to Mr. Rose on the open trading floor.  Mr. McCleary stated to Mr. Rose that

Mr. Kim does not use WhatsApp, but other phone messaging services like WeChat.  Mr. Kim

never messaged Mr. McCleary using a phone messaging service so he is unaware how he found

out this information.  Mr. McCleary boldly accosted Mr. Kim and threatened him saying that Mr.

McCleary can find out who Mr. Kim's enemies are by looking at his blocked list on FaceBook.

Additionally, Mr. McCleary stated the Mr. Kim "has an American Express Platinum card to show

off to girls."  Mr. Kim never made a purchase with his American Express Platinum card using

BTG Pactual's computer so he is unaware how he found out this information.

65.     After seeing that Mr. Kim's seating was oddly moved away from the ABS Team,

Compliance Officer Tuby Chan asked Mr. Kim what was the cause of the new seating

arrangement.  Mr. Kim told Ms. Chan that Mr. McCleary was seriously upset at Mr. Kim for

reporting the CDF team's fraudulent material marketing materials to Mr. Delapraz.  Ms. Chan

advised Mr. Kim to read the BTG Pactual Compliance Manual on the procedure on how to blow

the whistle to the SEC.

**E.     Harassment of Mr. Kim Escalates to Veiled Threats**

66.     Sometime after lodging his complaints of retaliation, Mr. Kim was approached by

Mr. Rose with a binder containing the resumes of BTG Pactual employees.  Pointing to the binder,

and referring to Mr. Kim, Mr. Rose stated aloud, "This guy is going to be blackballed by his

coworkers."   Mr. Kim felt intense stress and intimidation at the use of this term, because

blackballing is a well-known form of retribution against whistleblowers and truth-tellers in the

finance industry.

67.     Later that same day, Mr. Rose asked Mr. Kim, "Do you think you are smart because

you have a master's degree?  Will Li had a 4.0 from MIT."  Mr. McCleary was present and added,

"He's probably successful and trading Libor plus 100bps in Asia.  Your resume sucks."

68.     In a similar adversarial fashion, Mr. Argeros and Mr. Grant, who were ***not*** a part of the Compliance department would describe trades and positions in Mr. Kim's personal trading account.  The morning afterwards, Mr. Argeros mocked money losing trades that Mr. Kim made overnight in the European markets such as closing a position in Italian BTP futures because of a "two-point move against you."  Mr. Grant mentioned that Mr. Kim was "too cheap" to purchase real-time data for his Interactive Broker personal trading account.  Mr. Kim, however, never shared his personal trading information to the CDF team, but Mr. Argeros, Mr. Grant, Mr. Fath and other non-Compliance department employees had intimate real-time knowledge of that information.

69.     Mr. Grant fabricated and spread a false rumor around the office that Mr. Kim was involved in BitConnect, a crypto-currency Ponzi scheme.

70.     Towards the end of 2018, Mr. Rose falsely told Mr. Kim that he was under investigation for money laundering and that Mr. Kim was trying to start his own hedge fund.  Mr. Kim reported this to his supervisor Mr. Delapraz.  Mr. Kim was not, and has never been, under any such investigation and the statement was an utter fabrication.

71.     Mr. Rose grabbed Mr. McCleary when he was coming out of the men's room and started to describe a surveillance system that he gained access to that tracks every text message, email, and call made from a phone.  Mr. Rose used a Football metaphor "Eyes in the Sky looking at all angles and Jason Witten commenting."  Mr. Kim believes that Mr. Rose was making an analogy of his ability to monitor Mr. Kim's reporting of all actions made by the CDF team to his direct supervisor Chief Risk Officer Cyril Delapraz in London over the company email, Skype messaging system, and phone.  For reference, former NFL football player Jason Witten, tried to become a TV announcer but failed due to poor feedback from audiences.  Mr. Kim believes that BTG Pactual was surveilling his actions to prevent him from collecting and providing evidence of

the fraud to the SEC.

72.     One morning when Mr. Kim arrived and sat in his seat at the office to get situated, Mr. Rose started describing Mr. Kim's back profile from head to toe.  Mr. Rose described the Claimant's hair as "standing up from behind like someone just woke up" and his attire as "pink collared shirt" covered in a wool checkered [Filson hunting] jacket, purple Khakis, "colorful socks," and fancy black leather [Ferragamo] shoes off.  "That's where the stinky smell is coming from."  Because a row of computer monitors obstructed Mr. Rose's direct view of Mr. Kim and Mr. Rose was not looking under the desk to see if Mr. Kim's shoes were off, Mr. Kim became suspicious of the targeted surveillance.

73.     Mr. Rose hysterically said that the surveillance cameras are made by Huawei and that they are spying on Mr. Kim.

74.     Mr. Rose asked Mr. Kim why he was so fixated on reading the BTG Pactual Compliance Manual.  Again, Mr. Rose was on the other side of the row of computer screens, but seemed to have knowledge of what Mr. Kim was doing on his screen.

75.     Also, being on the other side of the row of computer monitors, Mr. Grant still greatly participated in the targeted surveillance and harassment.  Mr. Grant described as the "500 milligrams of caffeine" in the extra-large coffee mug on Mr. Kim's desk and on another occasion, Mr. Grant described as the large "number of calories in the buffalo chicken pizza slice" that Mr. Kim picked up from the Company catered pizza party lunch.

76.     Mr. Rose said that he found out Mr. Kim's IP address and that he would send an DDoS attack on Mr. Kim's home network.  Similarly, while holding up his phone, Mr. McCleary threatened Mr. Kim that he can easily figure out all the devices connected to a router by looking at the ISP web portal.  Mr. Grant claimed that his brother works for a cybersecurity firm run by former government employees in Silicon Valley and that it is easy to tap into someone's Amazon

Echo device.

77.     Mr. Rose proceeded to escalate his threats towards Mr. Kim.  Mr. Rose threatened to put Mr. Kim's social security number on the dark web.  This became a concern for Mr. Kim because Mr. Rose had already accessed Mr. Kim's resume and the Company has Mr. Kim's his social security number.

78.     Mr. Rose mentioned that he noticed that Mr. Kim logged into the BTG Pactual network at 2:00 am.  Mr. Rose later acknowledged that Mr. Kim was doing legitimate work at that time.  Instead, Mr. Rose tried to scold Mr. Kim saying that this was work that Mr. Kim should have done during business hours.  Mr. Rose was unaware that Mr. Kim was doing work for the London office before the European finance markets opened.

79.     After these cybersecurity threats, Mr. Kim unplugged all of his routers and computers in his NYC apartment and visited his parents in their Seattle home to secure their network.  When Mr. Kim returned to the office, Michael Grant said that "it looks like Frank is creating a technological moat."

80.     In or around January 2019, Mr. Grant told Mr. Kim that there were many home invasions occurring in the Upper West Side neighborhood of Manhattan and went into great detail describing them.  Upon information and belief, Mr. Grant knew that Mr. Kim's girlfriend at the time lived in the Upper West Side. This was said to make Mr. Kim believe that she could be intentionally harmed and made to look like a home invasion.

81.     In an effort to further intimidate Plaintiff, Messrs. Rose and Grant spoke in the office about their affinity for AR-15 rifles.

82.     In or around early February 2019, Brian Reed, Defendant's former COO, advised Plaintiff that Mr. Rose was targeting him with surveillance. Although this statement seemed extreme, a number of events took place that concerned Mr. Kim.  In an attempt to make Mr. Kim

paranoid, Bill Rose openly commented on intimate details regarding Plaintiff's daily routine outside of the office. This included but not limited to describing Mr. Kim's activities at home. McCleary further commented about the devices and electronics in Mr. Kim's home.  This was done to make Mr. Kim appear unstable in the event that he reported Defendants' illegal activity.

83.     In February 2019, Mr. Kim told Mr. Delapraz that Mr. McCleary had not passed a background check and was involved in an ongoing litigation.  Mr. Delapraz acknowledged that he had known about the litigation involving Mr. McCleary from his UBS days and had warned the Chief Executive Officer Steven Jacobs not to trust Mr. McCleary.

84.     In or around mid-February 2019, out of fear of being stalked by his colleagues, Mr. Kim and his girlfriend moved out of their respective apartments.  This was in direct response to Mr. Rose and Mr. McCleary's comments about surveilling them. To wit, Rose crudely commented that he would like to see Mr. Kim's facial expression during sex.

85.     Mr. Kim's girlfriend, a Concert Classical Pianist and Professor, wanted to marry Mr. Kim and set up a dinner for him to meet her mother, who was visiting from South Korea. During the dinner, her mother expressed dismay about Mr. Kim blowing the whistle.  Mr. Kim's girlfriend became more and more scared and cautioned Mr. Kim not to get her family members such as her younger brother involved.

86.     During the second week of February 2019, Mr. Kim reported to Mr. Delapraz the discriminatory and retaliatory behavior by the ABS team members directed towards him.

87.     Mr. Delapraz acknowledged to Mr. Kim that his allegations were serious and said he would speak with senior executives in BTG's main office in Brazil, if Mr. Kim wished.

88.     In or about the second week of February 2019, when Mr. Delapraz visited the New York office from London, Mr. Kim told Mr. Delapraz about the occurrences of harassment at the workplace.   Mr. Delapraz agreed that they were bullying Mr. Kim and that, if he felt

uncomfortable, he could go to London to work.   Mr. Delapraz further told Plaintiff that his accusations are serious and that it would be unwise of Mr. Rose to risk losing his title.   Mr. Delapraz said any leak of employee's personal information is "illegal" and that the perpetrator can go to "jail" for the act.

89.    In or about the second week of February 2019, when Mr. Delapraz visited the New York office from London, Mr. Delapraz confronted Mr. McCleary, Mr. Argeros, and Mr. Grant about getting a personal friend at a broker to mismark a level-3 illiquid bond price from 30 to 40, and their inability to demonstrate a good understanding of the risks of the bonds in their CDF strategy.   Mr. Delapraz warned Mr. McCleary, Mr. Argeros, and Mr. Grant that if this reckless behavior continues the CDF fund would be stopped from purchasing any additional assets.   Mr. Rose, Mr. McCleary, and Mr. Argeros started to mock the losses of the Complicated Catastrophe Bonds in the BTG Pactual Reinsurance Principal Investments fund.   Because of the lax compliance at BTG Pactual, the portfolio manager Simon Smart was able to purchase the positions without proper due diligence.   BTG Pactual colleagues suspected that Mr. Smart put on these complicated trades thinking that he would be the only one sophisticated enough to manage the position and in a selfish move to protect himself from any layoffs.

90.    Systemic harassment towards the Risk Management department by portfolio managers flourished at BTG Pactual.   Sandra Reineri, a fellow Market Risk Analyst at BTG Pactual, was also harassed by the portfolio managers.   In good faith, Ms. Reineri tried to keep the portfolio managers accountable for their questionable foreign exchange and interest rate mark prices.   In retaliation, the portfolio managers started to harass her.   Despite developing a courageous personality by serving in the Brazilian military service, Ms. Reineri reached a tipping point where she demanded to be moved to the London office, away from the portfolio managers harassing her.

91.     In or around early March 2019, Mr. Rose was on the telephone and yelled loudly enough for Mr. Kim and other employees to hear, "That gook[5]! If he ever talks back to me, I will wear my son's MAGA hat to work."  Mr. Kim believed, based on the context and his proximity to Mr. Rose, that the epithet was directed at him personally.

92.     On March 12, 2019, Mr. Argeros made his computer with its speakers say "gook!" so that the Mr. Kim could hear and also said "Gook! He doesn't know what that is!"  Afterwards, Mr. McCleary and Mr. Argeros started laughing hysterically.

93.     In or around March 2019, Mr. Kim met a friend in the finance industry who advised him to retain a lawyer as soon as possible.  Mr. Kim and his friend met at a macaroon store near Grand Central Station on 46th street.  Oddly, the Monday morning afterwards, the CDF team said that they would go to the same macaroon shop for lunch.

**F.     Plaintiff Is Placed on Administrative Leave**

94.     In approximately the end of March 2019, Mr. Kim was informed by Mr. Grant, a portfolio Manager, that he had incorporated "HUD" data (data from the US Department of Housing and Urban Development's Office) to value BTG Pactual's portfolio of peer-to-peer loans.  Mr. Kim was concerned that this gave rise to the risk of redlining (racially discriminatory exclusion of services).

95.     On or about April 1, 2019, Mr. Kim advised Mr. Grant of his concerns and advised him to inform Richard Gruber, Chief Compliance Officer, of the reliance on the HUD data, but Mr. Grant was reluctant to do so.

96.     In February 2019, Compliance Officer Tuby Chan told the Claimant that he can

---

[5]  "Gook" used as an insulting and contemptuous term for a nonwhite, non-American person and especially for an Asian person. The slur is frequently directed toward people of Filipino, Korean, or Vietnamese descent. It was originally predominantly used by the U.S. military during wartime, especially during the Korean War and the Vietnam War.

trust Chief Compliance Officer Richard Gruber to do the right thing and advised him to proceed in blowing the whistle.  At that time, Mr. Kim was unaware that Mr. Gruber previously served as Chief Compliance Officer at multi-billion dollar hedge fund Visium Asset Management.  In 2016, "three of the company's traders were indicted by United States federal authorities for securities fraud.  One of the accused employees killed himself days after he was indicted."

97.     In late March 2019, Mr. Kim complained to Mr. Gruber and Janira Almonte and Tereza Tolliver, BTG Pactual's leading human resources managers.  Among other things he complained of the discriminatory and retaliatory conduct to which he had been subjected.  He also stated that he was seeking legal counsel and that he was collecting evidence to provide to the SEC.  Mr. Gruber responded that BTG Pactual would investigate and keep Mr. Kim's complaint confidential.  Mr. Gruber also advised Mr. Kim to not collect evidence because of the "proprietary nature of the business."

98.     Upon information and belief, Mr. McCleary learned that Mr. Kim was considering initiating a lawsuit against Defendant BTG Pactual—how he learned this information is unclear and a deeply troubling breach of confidentiality.  On the week of April 4, 2019, Mr. McCleary said finance is a "White profession" and that "it's not like I'm suing the NBA."

99.     On April 5, 2019, one week after informing Gruber, Almonte, and Tolliver of the harassment and Mr. Kim's actions of collecting evidence to provide the SEC, and four days after reporting Michael Grant's use of HUD data for redlining, Gruber, Almonte, and Tolliver pulled Mr. Kim into a conference room and told him that he would be put on paid administrative leave immediately.  They also informed Mr. Kim that he had been cut off from the network and all email access.  Mr. Kim asked for a box to take his belongings.  Mr. Kim was informed that he could not take his belongings because he was not being terminated.  Mr. Kim's personal possessions were never returned, which included items that the harassers were describing on Mr. Kim's desk,

stamped letters to the regulators and additional evidence collected.  SEC Commission Rule 21F-17(a) prohibits any person from taking any action to prevent anyone from contacting the SEC directly to report a possible securities law violation.  The Rule states "[n]o person may take action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement…with respect to such communications."

100.   Over the period of June to July 2019, Mr. Kim participated in meetings as part of an internal investigation conducted by Skadden.  Mr. Kim raised the impropriety of using Skadden as an independent firm for investigating BTG Pactual, when the same firm routinely acts as representatives for the Company.

101.   Skadden verbally informed Mr. Kim's counsel (who then relayed it to Mr. Kim) of the outcome of its investigation on August 5, 2019, without any substantial detail of its conclusions.  No written outcome has ever been provided to Mr. Kim.

102.   On September 12, 2019, Mr. Kim filed a Form TCR with the SEC Office of the Whistleblower, formalizing his complaint concerning BTG Pactual's alleged securities violations.  Mr. Kim informed others at BTG Pactual that he had taken this step. The notification email included David Schwartz of Skadden, Steven Glaser of Skadden, Richard Gruber of BTG Pactual, Steven Jacobs of BTG Pactual, Cyril Delapraz of BTG Pactual, John Fath of BTG Pactual, Janira Almonte of BTG Pactual, Tereza Tolliver of BTG Pactual, William Rose of BTG Pactual, Roberto Sallouti of BTG Pactual, and Andre Esteves of BTG Pactual.  Shortly thereafter, on September 21, 2019, Pactual terminated Mr. Kim's employment in retaliation for his reporting to the SEC.  Mr. Kim sent an email explicitly telling all the BTG Pactual C-Suite executives that he filed a complaint with the regulators.  Mr. Kim sent several of these emails each time that he sent information to different regulators.

103.   In violation of SEC Rule 21F-17a, and despite knowing that Mr. Kim was gathering evidence to send to the SEC and other regulators, Chief Compliance Officer Richard Gruber and HR Managers Tereza Tolliver and Janira Almonte did not provide a box for Mr. Kim to take his personal belongings.   Mr. Kim specifically requested that the following personal property be returned:

1. Stamped Envelopes to the SEC.
2. Printouts of Documents (including Emails & BTG Compliance Manual)
3. Printouts of Financial Regulators and Discrimination Laws
4. Extra Large Yellow Starbucks
5. Finance Textbooks
6. Stamps and coins

As of April 28, 2022, BTG Pactual is still withholding evidence that Mr. Kim was collecting in the Company drawer at its New York Office.

**G.    BTG's Actions Created Serious Consequences for Plaintiff**

104.   As a result of Defendants' actions, Mr. Kim felt humiliated, degraded, victimized, embarrassed, and emotionally distressed.

105.   As a result of the Defendants' discriminatory and intolerable treatment of Mr. Kim, he suffered severe emotional distress.

106.   As a result of the acts and conduct complained of herein, Mr. Kim has suffered, and will continue to suffer, the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Mr. Kim has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.   Mr. Kim's reputation within the close-knit financial community has been tarnished.

107.   Defendants' actions and conduct were intentional and intended to harm Mr. Kim.

108.   As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Mr. Kim demands punitive damages as against the Defendants.

## COUNTS

### FIRST CAUSE OF ACTION
#### *Race Discrimination in Violation of Section 1981*

109.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

110.   42 U.S.C. § 1981 states in relevant part as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

111.   Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. § 1981, by discriminating against Plaintiff because of his race (Asian).

112.   Plaintiff was subjected to negative disparate treatment, discrimination, humiliation, embarrassment, adverse employment actions and loss of employment due to his race.

### SECOND CAUSE OF ACTION
#### *Retaliation in Violation of Section 1981*

113.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

114.   By the acts and practices described above, Defendants retaliated against Plaintiff for his opposition to unlawful discrimination under 42 U.S.C. §1981.

115.   Defendant acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

116.   Plaintiff is entitled to the maximum amount of damages allowed under this statute.

**THIRD CAUSE OF ACTION**
*Race Discrimination in Violation of the NYSHRL*

117.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

118.   New York State Executive Law §296(1)(a) provides that:

> It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, **race**, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

119.   As described above, Defendants discriminated against Plaintiff on the basis of his race, in violation of NYSHRL, by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, based on Plaintiff's race.  As a result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which he is entitled to an award of monetary damages and other relief.

120.   As a result of Defendants' unlawful discriminatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

121.   Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
*Retaliation in Violation of the NYSHRL*

122.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

123.   New York State Executive Law § 296(7) provides that:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she filed a complaint, testified, or assisted in any proceeding under this article.

124.   As described above, Plaintiff engaged in protected activities, including making internal complaints regarding Defendants' discrimination based on Plaintiff's race.

125.   As described above, after Plaintiff engaged in activity protected by the NYSHRL, Defendants took adverse actions against Plaintiff by, *inter alia*, terminating his employment, that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

126.   As a result of Defendants' retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

**FIFTH CAUSE OF ACTION**
*Race Discrimination in Violation of NYCHRL*

127.   Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

128.   The Administrative Code of City of New York § 8-107(1)(a) provides that

It shall be an unlawful discriminatory practice: for an employer or an employee or agent thereof, because of the actual or perceived age, **race**, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service or alienage or citizenship status of any person... to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

129.   As described above, Defendants discriminated against Plaintiff on the basis of his race in violation of the NYCHRL by, including but not limited to, subjecting him to disparate working conditions and denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment. As a result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which he is entitled to an award of monetary damages and other relief.

130.   As a result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

131.   Defendants' unlawful discriminatory actions constitute violations of the NYCHRL that amount to willful or wanton negligence, recklessness, and involve a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
*Retaliation in Violation of NYCHRL*

132.   Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above

with the same force and effect as if more fully set forth herein.

133.   The New York City Administrative Code § 8-107(7) provides that it shall be an unlawful discriminatory practice for an employer "to retaliate or discriminate in any manner against any person because such person has opposed any practices forbidden under this chapter…."

134.   As described above, Plaintiff engaged in protected activities, including making internal complaints regarding discrimination based on Plaintiff's race.

135.   As described above, after Plaintiff engaged in activity protected by the NYCHRL, Defendants took adverse actions against Plaintiff by, *inter alia*, terminating his employment, that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

136.   As a result of Defendants' retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

137.   Defendants' unlawful discriminatory actions constitute violations of the NYCHRL that amount to willful or wanton negligence, recklessness, and involve a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard for which Plaintiff is entitled to an award of punitive damages.

### SEVENTH CAUSE OF ACTION
*Violations of the Dodd-Frank Whistleblower Statute*

138.   Plaintiff repeats and realleges the allegations in the above paragraphs as if fully set forth herein.

139.   BTG Pactual is a financial services company authorized to do business in the State of New York and is under the jurisdiction of the Dodd-Frank Whistleblower statute 15 U.S.C. § 78u-6(h).  BTG Pactual solicits investors in securities and other investment products.

140.   Mr. Kim was Market Risk Analyst for the Company.  As detailed above, Mr. Kim reported his concerns about the Consumer Debt Fund and violations of the federal securities laws to his employer and to the SEC with the expectation that his concerns would be addressed.

141.   Instead, Mr. Kim was unlawfully retaliated against and discharged for his reporting of these securities law violations to the SEC.

142.   Section 922 of the Dodd-Frank Act, 15 U.S.C. § 78u-6 states that no employer may discharge a whistleblower because of any lawful act done by the whistleblower in providing information to the SEC regarding potential violations of the federal securities laws or in making disclosures that are required or protected under the Sarbanes-Oxley Act, the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*), or any other law, rule or regulation subject to the jurisdiction of the Commission.

143.   Mr. Kim's reports to the SEC regarding the inappropriate reporting of the Consumer Debt Fund's performance were protected by Section 806 of the Sarbanes-Oxley Act, 18 USC § 1514A and his termination based upon these internal reports violates the Dodd-Frank Whistleblower Statute, 15 U.S.C. § 78u-6.

144.   As a direct result of Defendants' violations of the Dodd-Frank whistleblower statute, Mr. Kim has been injured in an amount to be determined at trial based on the remedies afforded to him under Dodd-Frank.

## JURY DEMAND

145.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims in this action.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.      Declaring that Defendants engaged in unlawful employment practices prohibited by Section 1981, NYSHRL, and NYCHRL in that Defendants discriminated against Plaintiff on the basis of his race and retaliated against Plaintiff by subjecting Plaintiff to a hostile work environment for engaging in activity protected by the federal securities laws;

B.      Declaring that Defendants violated Dodd-Frank in discharging Plaintiff for reporting violations of securities laws to the SEC and declaring that Plaintiff is entitled to reinstatement, double back pay, with interest, and costs as set forth by statute;

C.      Awarding damages to Plaintiff resulting from Defendants' unlawful discrimination and retaliation and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

D.      Awarding Plaintiff compensatory damages related to injuries suffered as per Plaintiff's State-law claims;

E.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

F.      Awarding Plaintiff punitive damages;

G.      Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

H.      Awarding Plaintiff such other and further relief as the Court may deem equitable,

just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
      April 28, 2022

/s/Robert W. Sadowski
ROBERT W. SADOWSKI PLLC
757 3rd Avenue, 22th Floor
New York, New York 10022
(212) 503-5341
rsadowski@robertwsadowski.com

*Attorneys for Plaintiff Frank Kim*

36